## Diamond *versus* Lawrence County.

*Lis Pendens.—Rights and Liability of Purchasers of Municipal Bonds.*

1. A *lis pendens* in equity, not collusive and duly prosecuted, is notice to a purchaser, so as to affect and bind his interest by the decree, and begins from the service of the *subpœna* after the bill is filed; and is no more than the adoption of the common law rule in a real action where, if defendant aliens after the pendency of the writ, the judgment will overreach the alienation.

2. This doctrine is not confined to real actions, but is applicable to choses in action, except commercial paper not yet due.

3. The pendency of a suit between a county and a railroad company, in regard to bonds issued by the county, in payment of its subscription to the stock of the company, is notice to all the world of the facts alleged in the pleadings therein.

4. The purchaser of such a bond from the company, *pendente lite*, and all subsequent purchasers are affected by the decree of the court, in the suit pending at the time of the purchase.

5. Such bonds have not the quality of commercial paper in Pennsylvania: they are but bonds, and, even in the hands of innocent and remote purchasers, they are subject to the equities existing against them, when in the hands of the first purchasers from the company. The interest coupons are subject to the same equities.

6. All purchasers of such bonds are bound to take notice of the law under which they were issued. The court will enforce the payment of the bonds to the extent of the money which they brought to the company, and no further. Remote purchasers have no greater rights than the first purchasers from the company.

7. The cases in relation to municipal bonds, in 8 Casey 144 and 218, commented on.

ERROR to the Common Pleas of *Lawrence county.*

This was an action of debt, brought in the Common Pleas of Lawrence county to February Term 1860, by Daniel Diamond against the County of Lawrence, to which an appearance was entered by the defendant, and the issuing and service of the writ dispensed with.

To a declaration, and a copy of plaintiff's claim duly filed, the plea of *nil debet* and *payment with leave*, &c., was entered; and, on the 28th of January 1860, an agreement of the parties, as a case stated, was filed.

The case, as made up in the court below, recited at length the act to incorporate "The North-Western Railroad Company" (in which it was provided that the counties through which the company's road should pass were authorized to subscribe to the capital stock of the company); the action of a majority of the grand jury and commissioners of Lawrence county subscribing for four thousand shares of the capital stock of the company, payable in coupon bonds of the county, of $1000 each; sundry contracts with persons for building the road, by which they

1 WR.—23

[Diamond *v.* Lawrence County.]

were to receive, on account thereof, the bonds of certain counties, including those issued by Lawrence county; the issuing and transfer of one hundred bonds of $1000 each, with interest coupons, under the seal of the county; the proceedings in equity, in the Supreme Court of Pennsylvania, by the county of Lawrence against "The North-Western Railroad Company," for an injunction against the disposal of these bonds, and for their delivery for cancellation; the fact that after the service of the *subpœna* in that case upon the company, bond No. 56, with the coupons, had been transferred to a contractor, for work on estimates so ·made out by agreement with the company, as to pass it from the company at the rate of sixty-four cents on the dollar; that, after several subsequent transfers, the plaintiff became, and is the owner of a coupon for one of the semi-annual instalments of interest on which, after demand, this suit was brought; that the railroad is not yet completed, nor any part of it as yet located in Lawrence county; that the company never issued any stock to Lawrence county, · nor was the county ever represented at any meeting of the stockholders; that on the 19th of March 1859, the Supreme Court of Pennsylvania made their decree in the equity proceedings above mentioned (see 8 Casey 152); but that the said company have neither paid to the county of Lawrence the money therein ordered and decreed, nor made return of the bonds and coupons therein mentioned; and praying, in the usual form, the judgment of the court, reserving to each party the right to sue out a writ of error.

The court below entered judgment, *pro forma*, for the defendant, whereupon the plaintiff sued out this writ.

*D. B. Kurtz*, for plaintiff in error, argued:—1. That the county of Lawrence had power to subscribe to the stock of the railroad company.

2. That this power was executed in the manner pointed out by the act.

3. That the county had authority to issue bonds in payment of the subscription.

4. That the sale of the bonds of the company at less than their par value, though a violation of the Act of Assembly and a fraud on the county, could not be set up by the county to defeat a recovery by a subsequent *bonâ fide* holder for a full and valuable consideration.

5. That such bonds, though under seal, were payable to " bearer," and were intended to supply the place of commercial paper, and should be treated as such; should pass by delivery, enabling the purchaser to sue in his own name, and to hold them

[Diamond *v.* Lawrence County.]

discharged of all equities existing between the county and the company.

*L. Taylor* and *B. McComb*, for defendant in error, contrà.

The opinion of the court was delivered, January 7th 1861, by WOODWARD, J.—This case is here as a case stated. The plaintiff claims a judgment for the amount of a coupon accompanying bond No. 56, issued by the county to the North-Western Railroad Company, in part payment of the county's subscription to the stock of said company; which bond and coupon the company transferred to a contractor for work done on their road, and by several successive transfers the said bond and coupon came into the hands of the plaintiff for a valuable consideration.

It is made a part of the case, that on the 5th of June 1857, before the railroad company had transferred this bond, the county of Lawrence filed her bill in equity in the Supreme Court of Pennsylvania, against the railroad company and others, praying for an injunction upon the company against any disposition of the bonds of the county, and for a decree that said bonds be delivered up for cancellation. The *subpœna* issued, and was served before the company parted with this bond. On the 14th of March 1859, this court made their decree in the said suit (8 Casey 152), that the entire subscription of $200,000 on the part of the county to the stock of the company be, and the same was thereby annulled and set aside, without prejudice, however, to any rights which third persons may have lawfully acquired as purchasers of the bonds issued; and it was further decreed that the company restore to the county the $2000 of bonds that remained on hand, and pay to the county $198,000 in satisfaction of the bonds they had sold and transferred.

The pleadings and proofs in that case exhibited irregularities in the making of the subscription, and conduct exceedingly dishonest on the part of the directors of the company in the use they made of the bonds. The court, however, held the subscription valid, but the sale of the bonds void, because sold at 64 cents in the dollar, in direct violation of the Act of Assembly under which they were issued. It was on this ground, the illegal sale of the bonds below par, that the decree was founded. See the opinion of LOWRIE, C. J., 8 Casey 149.

It is manifest, from this statement, that the bond now in suit was transferred by the company in contempt of the authority of this court. After the service of the *subpœna* in the equity suit, the company had no authority, under any pretence whatever, to part with a bond. The directors, who were the governors of the company, were trustees of the stockholders. One of the largest of the stockholders had come into court on the equity side,

[*Diamond v.* Lawrence County.]

and complained of fraudulent mismanagement of the corporation, of the illegal issue of the bonds to the company, and of the illegal disposition of a portion of them by the company. Of our right to take jurisdiction of such a case there can be no question. That our jurisdiction attached from the moment the *subpœna* was awarded, is equally clear. Though no special or preliminary injunction was issued, it is apparent that if the company could, after· service of *subpœna*, go on and sell bonds, they might defeat our jurisdiction altogether. I am not now speaking of the right of a purchaser from them, but only of their right to sell, and, under the circumstances of the case, we hold that the sale of bonds, after service of the *subpœna* in equity, and before final decree, was an attempt to remove the subject of litigation beyond our jurisdiction, and so a contempt.

Now, as to the purchaser. Whether the purchaser of bond No. 56 is within the saving clause of the decree, depends upon the question whether he is to be affected with notice of the equity suit. He, and all under whom he claims, purchased after the institution of that suit. Were their rights lawfully acquired?

The doctrine of *lis pendens* in this country is founded on Chancellor Kent's opinion, in Murray & Winter *v.* Ballou & Hunt, 1 Johns. C. R. 566, delivered in 1815. Winter, a trustee of lands, was sued in equity by his *cestui que trust*, for breach of trust. Pending the suit he sold part of the trust lands to Ballou without any actual notice of any breach of trust, or of any suit against the trustee, and for a full consideration, which Ballou paid. After full argument, Ballou was held to be a purchaser with notice, and was decreed to give up the land to the *cestui que trust* or to pay for it again. "The established rule is," said the chancellor, "that a *lis pendens*, duly prosecuted, and not collusive, is notice to a purchaser so as to affect and bind his interest by the decree; and the *lis pendens* begins from the service of the *subpœna* after the bill is filed." He added, "that it is no more than the adoption of the rule in a real action at common law, where, if the defendant aliens after the pendency of the writ, the judgment in the real action will overreach such alienation." It was one of the ordinances of Lord Bacon (see his Works, vol. 4, p. 511), laid down for the better and more regular administration of justice in the Court of Chancery—that "no decree bindeth any that cometh in *bonâ fide*, by conveyance from the defendant, before the bill exhibited, and is made no party, whether by bill or order; but where he comes in *pendente lite*, and while the suit is in full prosecution, and without any colour of allowance or privity of the court, there regularly the decree bindeth."

In Murray *v.* Lylburn, 2 Johns. C. R. 441, the principles

[Diamond v. Lawrence County.]

asserted in Murray v. Ballou were held to apply to choses in action as well as to real estate, and to entitle a *cestui que trust* whose land had been fraudulently disposed of by the trustee during a suit brought against him, not merely to the land itself, *but to the mortgages or other securities taken for the purchase-money against purchasers or assignees claiming title under sales or assignments made while the suit was pending.*

"The ground," said Chancellor Kent, "on which I place the right of the *cestui que trust* to pursue the bond and mortgage in the hands of the assignee of Winter, is the constructive notice to all the world, arising from the bill and supplementary bill, filed in 1809, against Winter, for a breach of trust." This he held to be agreeable to the doctrine that an assignee of a chose in action takes it subject to all the equity of the obligor, though not subject to latent equities residing in third persons against the assignor; but he made a doubt, whether the rule of *lis pendens* was to be carried so far as to affect cash, negotiable paper not due, or movable personal property, such as horses, grain, &c., when received in payment for the trust estate.

The doctrine laid down in these cases is said by Hare & Wallace, in the 2d vol., p. 123, of their Leading Cases in Equity, to be generally adopted throughout the United States, both by courts of law and equity. And they cite Griffith v. Griffith, 1 Hoffman 153; Jackson v. Ketchum, 8 Johns. 479; Harris v. Carters' Adm'r. 3 Stewart 233; Tongue v. Martin, 6 Harris; 1 Johns. 21; Orwigs v. Myers, 3 Bibb 279; Jackson v. Andrews, 7 Wend. 152; Lodge v. Simonton, 2 Pa. R. 439. To which I take leave to add Bolling v. Carter, 9 Alabama R. 921; Chandron v. Magee, 8 Id. 570; Green v. White, 7 Blackford 242; Walker v. Butz, 1 Yeates 574.

The American cases, which have limited and qualified the doctrine of *lis pendens* as here stated, will be found collected in a note to page 385 of Adams' Equity. The most material of these cases is French v. The Loyal Company, 5 Leigh 627, where it was held that the doctrine of *lis pendens* can only affect a purchaser from the party to the suit of the subject of controversy. This is a very material limitation, and would, if it were followed, save the plaintiff's case.

But considering the peculiarities of this case, and especially the extraordinary notoriety which attended the equity suit against the railroad company, we think the rule is applicable here without that limitation. And according to the rule, the suit was notice to all the world, of all the facts alleged in the pleadings, so that this plaintiff stands in no better situation for enforcing the bond against the county than the company themselves would stand. If we would not compel the county to pay the coupon to the company, for the reasons to be found in that

[Diamond *v.* Lawrence County.]

suit, for the same reasons we will not compel them to pay the plaintiff.

It is argued that the bonds and coupons are negotiable instruments, and therefore, that this defence, like all others, is excluded. We have said, on several former occasions, that we will not treat bonds like these as negotiable securities. On this ground we stand alone. All the courts, American and English, are against us. Be it so. We are not insensible to the importance of this fact, nor are we wanting in deference to the learning and wisdom of the judges who differ from us. But we are a Pennsylvania tribunal, sitting in judgment on an occasional and extraordinary security for money created under Pennsylvania statutes. We know the history of these municipal and county bonds—how the legislature, yielding to popular excitements about railroads, authorized their issue; how grand juries, and county commissioners, and city officers, were moulded to the purposes of speculators; how recklessly railroad officers abused the overwrought confidence of the public, and what burdens of debt and taxation have resulted to the people. A moneyed security was created and thrown upon the market by this paroxysm of the public mind, and the question is now, how shall the judicial mind regard it?

According to the law merchant, the purchaser of negotiable paper takes it discharged of all equities betwixt the original parties, but the law merchant is a branch of the common law that is founded in the usages of trade and business among merchants. It is not a temporary, local, statutory system, but a permanent and universal jurisprudence, having no root in any statute; the same thing, substantially, all over the civilized world, and its uniformity essential to the maintenance of the commerce of the world.

Why should these bonds be referred to *that* system of jurisprudence? They are temporary, and will never be repeated again whilst the world stands. They are local in their origin, issued by counties, cities, and boroughs here in Pennsylvania, not for ordinary indebtedness, nor for purposes which belong naturally to such municipalities, and they are rendered lawful only by a special and extraordinary exercise of legislative omnipotence. Unlike bills of exchange, they do not grow up out of the daily business of mankind, but are creatures of statute law. They generally recite on their face, or refer *to*, the authority by which they exist. They are called by the legislature "certificates of loans or bonds"—never notes or bills. They always bear a broad plain impress of a seal, which is the only test of their authenticity, and which, added to a bill of exchange, would instantly destroy its commercial character the world over. The only point of resemblance between them and bills of exchange

is, that both are payable to bearer; but let it be remembered, that any sealed instrument for money may be made to a particular payee "or bearer," whilst no negotiable instrument can be made under seal. It may be added that the Constitution of Pennsylvania has been so amended as to forbid a future issue of such bonds—a provision which nobody ever regarded as a blow at commercial paper. These are distinctions which justify any court in refusing to treat bonds of this nature as commercial paper.

But it is said the rights of innocent purchasers cannot be protected unless these distinctions be disregarded. I reply, the rights of innocent tax-payers cannot be protected if they are. No man can go over the history of these bonds and fail to see that there are two parties involved, both of whom are worthy of the regards of the judicial eye. On the one hand, there are the purchasers who have invested their money, generally at a large discount, but on the faith that the people whose representatives have issued the bond will see to its redemption; and on the other, there are the people whose representatives have hurried them thoughtlessly into oppressive indebtedness, without an equivalent. Now, if equal justice is to be administered to both parties, no narrow and technical grounds can be assumed, and certainly the bond must not be treated as a bill of exchange. Nor can the coupon, for it is part of the same instrument, and is not of itself a complete contract.

What then is equal justice both to purchasers and people in respect of these bonds? Seeing that the people have, at the least, *permitted* their accredited agents to issue them, and that *some* consideration was received for them in the stock subscribed, and in the progress of the work, there is reason in holding them bound to pay so much money on each bond as it brought into the treasury of the company. That money, whether honestly applied to the work or not, was honestly paid in, for the purpose of being so applied. For that money, when it falls due, and for the interest as it accrues, the county would seem, on all principles of equity and fair dealing, to be justly liable to the holder of the bond. But the holder ought not to have more than that money, because he, or others under whom he claims, purchased the bond of the company in violation of the only law which ever legalized the bond. It was forbidden to be sold under par, and all purchasers were bound to take notice of this. Generally, second and third, and more remote purchasers, pay less for such securities than the first purchaser from the company. So that when we give them the amount the first purchaser paid, they have nothing to complain of, except that the speculation turns out not quite as large as was intended.

This, then, is our ground—enforcement of the bond to the extent of the money it actually brought the company, but no

[Diamond *v.* Lawrence County.]

entanglements of communities in the meshes of commercial law, for the purpose of holding them liable beyond this extent. We intimated in Thomas's Case, 8 Casey 230, that this would be our ground when a case was presented in proper shape; and, though no case has yet been presented, we have stood firmly against the tendency of the judicial mind, everywhere else, to treat these special and peculiar securities as bills of exchange. And we have maintained this position perseveringly, in order that we may the better administer even-handed justice to both parties.

This explanation of our position is necessary, as showing why we allow the rule of *lis pendens* its natural and legal operation in this case. Diamond did not buy mercantile paper, but a *bond*—a bond that was the subject of a pending suit in equity, and, therefore, he purchased it with notice of all the facts of that record.

But the statement of our position on the above question, bears a more direct relation to one of the questions now before us. It is made a part of the case that the bonds were sold at sixty-four cents in the dollar, contrary to the Act of Assembly, and one of the questions submitted is, whether the plaintiff, if entitled to a judgment at all, would be entitled to a judgment for more than the bond sold for. We decide that he is entitled to no judgment, because of the *lis pendens;* but that if he could recover at all, he could recover only the amount for which the company sold the bond.

It is not necessary for us to discuss the irregularities of the subscription made by the county, nor the authority of the county to make it. In the case in 8 Casey, the subscription was held to be valid, and we should doubtless reach the same conclusion again, if we were to review the whole ground. But because it is not necessary, we forbear to do it.

The judgment is affirmed.